**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Continental Circuits LLC, | No. CV16-2026 PHX DGC |
| Plaintiff, | **ORDER** |
| v. | |
| Intel Corporation, et al., | |
| Defendants. | |

Plaintiff Continental Circuits LLC asserts claims for patent infringement against Defendants Ibiden U.S.A. Corp., Ibiden Co. Ltd., and Intel Corp. The Court held a *Markman* hearing on August 4, 2017. This order will set forth the Court's ruling on the issues addressed during the hearing and in the parties' briefs.

## I.    Background.

Defendant Ibiden produces layered electronic devices at its facilities overseas. *See* Doc. 133, ¶¶ 51, 110.[1] These layered devices are used in computer electronics, including computer processors manufactured by Defendant Intel. *See id.*, ¶¶ 49-51.

The devices are made of alternating layers of conductive and non-conductive materials. *See id.*, ¶ 29. When adhesion between the layers is poor, the layers can separate, creating problems for or failure of the electronic product in which they are

---

[1] Page citations are to numbers placed at the top of each page by the Court's CM/ECF system rather than the document's original page numbers.

1  incorporated.  *See id.*  In the 1990s, four employees of Continental Circuits, Inc., a now-
2  defunct circuit-board manufacturer, invented a "novel surface roughening technique"
3  using etching to create a "non-uniformly roughened surface" that allows for stronger
4  adhesion between layers.  *Id.*, ¶¶ 28-29, 120.  The four co-inventors applied to patent the
5  surface-roughening technology in 1997, and two patents were issued in 2000 and 2004.
6  *Id.*, ¶¶ 12-13.  Those patents are not at issue in this case.  A continuation application was
7  filed by early 2005, and eventually resulted in the issuance of the four patents that are at
8  issue here:  U.S. Patent Nos. 7,501,582 (2009), 8,278,560 (2012), 8,581,105 (2013), and
9  9,374,912 (2016) (collectively, the "patents-in-suit").  *See id.*, ¶¶ 14-17, 35-36.  Copies of
10 these patents can be found at Doc. 188-3, Exs. 1-4.

11     Plaintiff Continental Circuits LLC is a non-operating entity that was formed in
12 2016 and owns the patents-in-suit.  Doc. 49, at 11 n.8; Doc. 133, ¶ 19.  The day after the
13 last of the patents-in-suit was issued, Plaintiff filed this action.  *See* Doc. 1.  Plaintiff
14 alleges that Defendants have infringed the patents-in-suit.

15     The parties have filed a joint claim construction statement that identifies the patent
16 terms to be addressed in this order.  Doc. 177.  The statement identifies three categories
17 of claims to be construed, each of which includes a number of closely related claims
18 found in the patents.  *Id.*  It also identifies four terms that Defendants claim are indefinite
19 and therefore invalid.  *Id.*  The parties have filed briefs on claim construction.  Docs.
20 188, 189, 199, 200.  At the Court's request, the parties filed additional memoranda
21 regarding the ramifications of their claim construction positions.  Docs. 225, 230.[2]

22 **II.    Legal Standard.**

23     A patent includes two basic components: (1) a written description of the invention,
24 referred to as the "specification" of the patent, and (2) the patent claims.  The claims
25 define the scope of the invention covered by the patent.  *Phillips v. AWH Corp.*, 415 F.3d

26
27 _____

28     [2] Some of the parties' filings are redacted to remove trade secrets.  Unredacted versions have been filed under seal at Docs. 234-238.

1303, 1312 (Fed. Cir. 2005) (en banc). Claim construction is a matter of law to be decided by the Court. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996).

Words of a claim are generally given the ordinary and customary meaning the words would have for a person of ordinary skill in the art at the time of the invention. *Phillips*, 415 F.3d at 1313. "[T]he person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* The specification is also highly relevant. The Federal Circuit has characterized it as "the single best guide to the meaning of a disputed term." *Id.* at 1315 (quotation marks and citation omitted). A court may also consider the patent's prosecution history. *Id.* at 1317. "Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent." *Id.* The claims, specification, and prosecution history are commonly referred to as "intrinsic evidence."

Extrinsic evidence may also be used in claim construction. Extrinsic evidence consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, learned treatises, and other patents. *Id.* Extrinsic evidence is viewed as less reliable than the patent and its prosecution history in determining how to read claim terms. *Id.* at 1318.

## III. Category 1 Terms.

Category 1 in the parties' joint claim construction statement concerns a number of claims in the patents-in-suit that address the etching of the dielectric or epoxy layer of an electronic circuit board or comparable device. Doc. 177 at 4-9. Some of the claims simply refer to "etching the epoxy," while others refer to "etching the dielectric material," "removal of a portion of the dielectric material," "removal of some of the dielectric material," "a surface of a layer of a dielectric material," "a surface of a dielectric material," and "a dielectric material comprising a surface." *Id.* Plaintiff contends that these phrases require no construction. Defendants contend that each phrase

should be construed to include a requirement that the etching, removal, or modification of the dielectric material be "produced by a repeated desmear process." *Id.*

As Plaintiff correctly notes, Defendants do not contend that the actual words of the claims provide this additional meaning. Rather, Defendants seek to add a limitation to the claims – namely, that the etching or alteration of the dielectric material occur through a repeated desmear process. Because the plain and ordinary meaning of the phrases at issue does not include Defendants' proposed limitation, Defendants carry a heavy burden. The Federal Circuit has explained that there are only two exceptions to the rule that claims are given their plain and ordinary meaning: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). The standard Defendants must meet for either of these exceptions is "exacting." *Id.* at 1366.

"To act as its own lexicographer, a patentee must 'clearly set forth a definition of the disputed claim term' other than its plain and ordinary meaning." *Id.* at 1365 (quoting *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002)). "It is not enough for a patentee to simply disclose a single embodiment or use a word in the same manner in all embodiments, the patentee must 'clearly express an intent' to redefine the term." *Id.* (quoting *Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1381 (Fed. Cir. 2008)).

A disavowal also must be "clear and unmistakable." *Id.* at 1367. "'Where the specification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question.'" *Id.* at 1366 (quoting *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001)). "'The patentee may demonstrate intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest

- 4 -

1  exclusion or restriction, representing a clear disavowal of claim scope.'" *Id.* (quoting
2  *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002)).

3      After careful review of the patents-in-suit, the Court concludes that Defendants
4  have met the exacting standard required to adopt their proposed limitation.

5      **A.     The Patents' Disavowal of Prior Art.**

6      The Federal Circuit has found disavowal when a patent "repeatedly disparaged an
7  embodiment as 'antiquated,' having 'inherent inadequacies,' and then detailed the
8  'deficiencies [that] make it difficult' to use." *See GE Lighting Solutions, LLC v.
9  AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) (quoting *Chi. Bd. Options Exch.,
10  Inc. v. Int'l Sec. Exch., LLC*, 677 F.3d 1361, 1372 (Fed. Cir. 2012)).  For example, in
11  *Inpro II Licensing, S.A.R.L. v. T-Mobile USA, Inc.*, 450 F.3d 1350, 1354-55 (Fed. Cir.
12  2006), the Federal Circuit affirmed the construction of "host interface" as a "direct
13  parallel bus interface."  The court noted that the only embodiment disclosed was a direct
14  parallel bus interface and that "the specification emphasizes the importance of a parallel
15  connection in solving the problems of the previously used serial connection." *Id.*  This
16  discussion demonstrated "what the inventor has described as the invention." *Id*. at 1355;
17  *see also OpenWave Sys., Inc. v. Apple Inc.*, 808 F.3d 509, 513-17 (Fed. Cir. 2015)
18  (narrowly construing claim term "mobile device" to exclude communication devices
19  containing a "computer module" based on limiting statements in specification that
20  disparaged prior art communication devices containing such "computer modules"); *Fed.
21  Retractable Techs., Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296, 1305 (Fed. Cir.
22  2011) (limiting scope of syringe "body" to a one-piece body based in part on distinction
23  of prior art syringes composed of multiple pieces); *SciMed*, 242 F.3d at 1341 (finding
24  disavowal based on disparagement of a particular embodiment and statements that the
25  "present invention" does not include the embodiment).

26      The specification, which is common to all the patents-in-suit, provides this
27  introduction:  "The present invention is directed to methods for making or manufacturing
28  an electrical device, and the process, composition, and product thereof.   More

particularly, the present invention involves such multi-layer electrical devices as circuit boards constructed by joining a dielectric material to a subsequently applied conductive material." '582 Patent at 1:13-18.[3]  The purpose of the invention is to improve on multi-layer electrical devices that "suffer from delamination, blistering, and other reliability problems.  This is particularly true when the laminates are subject to thermal stress." *Id.* at 1:30-32.

The specification explains that the patented invention produces a stronger bond between the dielectric layer and the conductive layer by forming teeth in each layer that interlock with each other.  "The surface structure is comprised of teeth that are preferably angled or hooked like fangs or canine teeth to enable one layer to mechanically grip a second layer." *Id.* at 1:54-57.

The specification then proceeds to explain the process by which these teeth are formed in the manufacturing of a multi-layer electrical device.  Step 6 is the relevant step for purposes of Category 1 claims.  Step 6 "involves the etching [of] cavities, veins, openings, or gaps in the applied dielectric material, or more particularly an outermost surface thereof, to accommodate the teeth." *Id.* at 5:37-40.  The process by which layers of dielectric material are prepared for boding to a conductive layer is known as a "desmear" process.  The '582 Patent repeatedly distinguishes the process covered by the patent from the prior art and its use of a "single desmear process."  Five portions of the specification are particularly relevant.

First, the specification explains that "[o]ne technique for forming the teeth is somewhat similar to what has been known as the swell and etch or desmear process, except that **contrary to all known teachings in the prior art, in effect, a 'double desmear process' is utilized.**" *Id.* at 5:41-44.[4]  The description then becomes even more specific: "That is, not merely increasing the times and temperatures and other parameters for the

---

[3] The parties' Category 1 arguments all focus on the '582 Patent.  The Court will focus on that patent as well.  The Court's citations to portions of a patent throughout this order will include a column number and line numbers, separated by a colon.

[4] All bolded and italicized emphases in this order have been added by the Court.

desmear process, **but instead completing the process a first time, and then completing the process a second time**." *Id.* at 5:44-48.[5]

Second, the patent explains that "the desmear process **as disclosed herein** is contrary to the manufacturer's specification, **i.e., a 'double desmear process,' rather than the single desmear process of the known prior art**." *Id.* at 5:60-63. This statement not only equates the prior art with a "single desmear process," but specifically states that "the desmear process as disclosed herein" is "contrary" to that prior art.

Third, the specification explains:

> the peel strength produced in accordance with **the present invention** is greater than the [peel] strength produced by **the desmear process of the prior art, i.e., a single pass desmear process**. For example, if a **prior art desmear process** is used to produce a 6 lb/in average peel strength, **the present invention** may produce an average peel strength on the order of 10 lb/in or more.

*Id.* at 7:3-9. This statement again equates the prior art with "a single pass desmear process," and states that "the present invention" produces a greater strength than that prior art.

Fourth, the patent recommends the use of Probelec XB 7081 for creation of the dielectric layer. The specification contains this explanation:

> Although Probelec XB 7081 apparently was intended for use in the common desmear (swell and etch) process as used in conventional plated through hole plating lines, Probelec XB 7081 **can alternatively be used in carrying out the present invention**. For example, **the present invention differs from the common desmear process in that sub-steps in the desmear process are repeated as a way of forming the teeth**.

*Id.* at 8:45-52. This language explains that although Probelec XB 7081 was intended for the prior art process of single desmear, it "can alternatively be used in carrying out the present invention." In other words, the prior art single desmear process is not "the

---

[5] Plaintiff emphasizes that this description applies to "[o]ne technique for forming the teeth," arguing that this is only an illustration. The Court will address this argument below.

present invention."  It also explains precisely how "the present invention" differs from the prior art:  "sub-steps in the desmear process are repeated as a way of forming the teeth."

Fifth, the specification contains this strong statement:  "In ***stark contrast*** with the etch and swell process of the ***known prior art***, however, a second pass through the process (sub-steps A through F) is used.  The second pass seems to make use of non-homogeneities in bringing about a formation of the teeth."  *Id.* at 9:1-9.  This language draws a "stark contrast" between the "known prior art" and the current invention's "second pass through the process."

In summary, these statements identify the "swell and etch" or "single desmear" process as the "prior art," the "known prior art," the "common desmear process," and "the desmear process of the prior art," and expressly distinguish that prior art from the patented invention.  The specification states that the invention is "contrary to all known teachings in the prior art" (*id.* at 5:43-48), is "contrary" to "the single desmear process of the known prior art" (*id.* at 5:61-63), "differs from the common desmear process" (*id.* at 8:50-52), and stands in "stark contrast" with the "known prior art" (*id.* at 9:1-3).  These statements are clear and strong.  They do not merely point out deficiencies in the prior art, they state with emphasis that this invention is different from the prior art.  They make clear that the invention does not include the prior art's single desmear process.

## B. "The Present Invention."

When an inventor describes "the present invention" as including particular elements, it can be viewed as a disavowal of a broader scope that might otherwise apply. *See Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1372 (Fed. Cir. 2014) ("[W]e have held that disclaimer applies when the patentee makes statements such as 'the present invention requires . . .' or 'the present invention is . . .' or 'all embodiments of the present invention are . . .'"); *see also Pacing Technologies, LLC v. GarminIntern., Inc.*, 778 F.3d 1021, 1025 (Fed. Cir. 2015).

In *Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 452 F.3d 1312, 1318 (Fed. Cir. 2006), the court addressed a "fuel injection system component." Although the ordinary meaning of a "fuel injection system component" is not limited to a fuel filter, the Federal Circuit found that the proper construction was narrower than the customary meaning and was limited to a filter. The court noted that the specification repeatedly described the fuel filter as "this invention" and "the present invention," and held that "[t]he public is entitled to take the patentee at his word and the word was that the invention is a fuel filter." *Id.*; *see also Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1327 (Fed. Cir. 2009) (limiting the claim term "graft" to mean "intraluminal graft" when "the specification frequently describes an 'intraluminal graft' as 'the present invention' or 'this invention'").

As shown in the quotations above, the specification states that "the peel strength produced in accordance with **the present invention** is greater than the [peel] strength produced by the desmear process of the prior art, i.e., a single desmear process." '582 Patent at 7:3-6. This statement suggests "the present invention" produces results different from the single desmear process. The specification also states that "**the present invention** differs from the common desmear process in that sub-steps in the desmear process are repeated as a way of forming the teeth." *Id.* at 8:50-52. This statement clearly asserts that "the present invention" – not just the embodiment discussed in the specification as an example – differs from the prior art because it involves a repeat of the desmear process. The specification further states that "**the desmear process as disclosed herein** is contrary to the manufacturer's specifications, i.e., a 'double desmear process,' rather than the single desmear process of the known prior art." *Id.* at 5:59-63. Although this statement is addressing the specifications of the XB 7081, it also states that "the desmear process as disclosed" in the patent is a "double desmear process." These statements unmistakably affirm that "the present invention" differs from the single desmear process of the prior art.

**C.  Prosecution History and Other Portions of the Patents.**

As Defendants note, the examiner rejected all pending claims during prosecution of the '560 Patent.  Doc. 188-3 at 155.  In response, the applicants submitted a declaration from Professor C.P. Wong, Ph.D, which included this explanation:

> As described in this paragraph, performing two separate swell and etch steps is a technique which forms the teeth.  Although how this occurs within the dielectric material is not recited with in-depth detail, I understand the specification as informing that the teeth formation results from the release of some solid content in the first etching pass, forming irregular recesses and volume displacement.  By forming the irregular releases in the first etching pass, an opening within the dielectric material would then be enlarged in the second etch pass, making the structure shown in Figure 1 and recited in the claims[.]

Doc. 188-3 at 109.

This statement clearly describes the patented method as involving two etching processes.  Although Plaintiff correctly notes that Dr. Wong refers only to "a technique" as opposed to "the technique," Dr. Wong explains that the patented teeth are created by the second etching pass.  This part of the prosecution history corroborates the conclusions reached above, even if not sufficient on its own to find disavowal.

Other portions of the patents also support the conclusions reach above.  For example, the '582 Patent includes claims which assert that the products produced by the patented process are superior to products created by "a single roughening process," "a single pass roughening," or "a single desmear process."  *See, e.g.,* '582 Patent at 10:25, 10:33-34, 11:4, 11:11, 11:48, 11:55, 12:2, 12:15, 12:42-43, 12:59, 14:7, 17:34, 17:38-39, 18:1, 18:6, 18:36-37, 18:41-42, 19:10-11, 19:14-15, 19:26. 19:40, 19:66-67, 20:15-16.  These claims are not at issue in this case, but both sides agreed during the *Markman* hearing that the Court can consider them in this order.  Their wording confirms that the present invention is different from a single desmear process.

Defendants also point to extrinsic evidence that supports the Court's conclusion.  Documents produced by the inventors state that "a two pass desmear cycle doubles the

peel strength of a one pass desmear cycle, but varying the times in the cycle do not seem to have that great of an effect."   Doc. 235-2, Ex. 26.   The primary inventor of the patented product, Brian McDermott, wrote in a 1998 letter that "we use a double pass desmear to achieve the tooth structure."   Doc. 235-3, Ex. 30.   This extrinsic evidence, although not reliable enough to be dispositive, provides helpful corroboration of the Court's conclusion. *Phillips*, 415 F.3d at 1319 (explaining that extrinsic evidence "may be useful to the court").

### D.    Plaintiff's Arguments.

Plaintiff relies on the principle of claim differentiation and argues that references to a repeat desmear process are found in several independent claims, but not in dependent claims.   Doc. 189 at 16.   Plaintiff notes that "the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Phillips*, 415 F.3d at 1315.

The claim differentiation presumption can be overcome by clear indicia in the specification and prosecution history.   As the Federal Circuit has explained, "claim differentiation is a rule of thumb that does not trump the clear import of the specification." *Edwards*, 582 F.3d at 1332; *see also Seechange Int'l, Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1369 (Fed. Cir. 2005) (noting that claim differentiation is "not a hard and fast rule and will be overcome by a contrary construction dictated by the written description or prosecution history.").

The Court finds, for reasons explained above, that the specification clearly distinguishes between the current invention and the prior art of a single desmear process. The clear and unequivocal rejection of that prior art overcomes any presumption raised by claim differentiation.

Plaintiff also notes that the specification begins its discussion of the double desmear process by describing it as "[o]ne technique for forming the teeth[.]"   '582 Patent at 5:40-41.   Although this is true, the patent then proceeds to explain at length the difference between the current invention and the prior art single desmear process.   As

already noted, in two places the specification distinguishes this prior art from "the present invention." Thus, although the specification does include a reference to "one technique," the subsequent, detailed explanation makes clear that the patented invention is different from the single desmear process.

Similarly, the words "for example" in one portion of the specification do not suggest that the double desmear process is only an illustration of one embodiment of the patented invention. *Id.* at 8:49-50. Rather, the language is used to explain why XB 7081, which is normally made for a single desmear process, "can alternatively be used in carrying out the present invention." *Id.* at 8:48-49. The specification states: "For example, the present invention differs from the common desmear process in that sub-steps in the desmear process are repeated as a way of forming the teeth." *Id.* at 8:49-52. Thus, the example is not one means by which the invention may be embodied, but an explanation of why XB 7081 can be used with the patented product – by repeating the desmear process for which XB 7081 was designed.

Plaintiff notes that an early statement in the specification refers to methods of production other than repeated desmearing: "For example, a dielectric material can have a non-homogeneous composition or thickness to bring about an uneven chemical resistance, such that ***slowed and/or repeated etching*** will form teeth instead of the uniform etch." *Id.* at 2:27-30. Plaintiff argues that this sentence identifies "slowed" etching as an additional method for making the patented invention, in contrast to repeated etching. The word "slowed" does appear once in the specification, but the Court cannot conclude that this single word justifies a finding that the patents include the single desmear process.

As explained above, the balance of the specification makes clear that the single desmear process of the prior art is not part of the invention. In fact, it is part of the problem the invention was designed to overcome. Defendants' expert, Dr. Srini Raghavan, also credibly explains in his declaration that a person of ordinary skill in the art would not read the word "slowed" in the context of the patents to mean that the

patents embrace single-pass desmearing.  Doc. 199-3, ¶¶ 15-17.  Finally, language in the specification and in the extrinsic evidence suggests that varying the times of a single desmear process does not produce the teeth that are key to the invention.  *See* '582 Patent at 5:43-47; Doc. 235-2, Ex. 26.  For these reasons, the Court cannot accept Plaintiff's argument that the single word "slowed" constitutes an alternative embodiment of the patented invention.  *See Trustees of Columbia University in City of New York v. Symantec Corp.*, 811 F.3d 1359, 1366 (Fed. Cir. 2016) (explaining that "[t]his single sentence in the specification cannot overcome the overwhelming evidence in other parts of the specification").

Finally, the Court notes that the boilerplate disclaimer of lexicography and disavowal at the end of the specification does not alter its conclusion.  '582 Patent at 9:18-25.  The Court finds the detailed and repeated explanation of the specification, not this disclaimer, to be controlling.

**IV.  Category 2 Terms.**

The parties' second category of disputed claims includes the following phrases from the '560, '105, and '912 Patents:  "Epoxy dielectric material delivered with solid content," "epoxy dielectric material . . . the dielectric material delivered with solid content," "dielectric material delivered with solid content," "dielectric material that is delivered with solid content," and "dielectric material delivered with . . . solid content."  Doc. 177 at 12-13.  Defendants contend that each of these phrases should be construed to mean dielectric material "delivered with solid particles suspended in a liquid."  *Id.*  Plaintiff contends that no construction is necessary.  Alternatively, Plaintiff contends that the phrases should be interpreted to include "dielectric material having solid particles suspended in the dielectric material."  *Id.*  The dispute is whether the patents require the use of liquid dielectric material in manufacturing the multi-layer electronic devices they cover.  For several reasons, the Court concludes that Plaintiff is correct – the patents do not require use of a liquid dielectric material.

## A.    Plain and Ordinary Meaning.

As noted above, words of a claim are generally given the ordinary and customary meaning the words would have to a person of ordinary skill in the art at the time of the invention.  *Phillips*, 415 F.3d at 1313.  The Court concludes that the plain and ordinary meaning of the words in Category 2 does not require use of a liquid dielectric material.

The parties agree that dielectric material can be applied either in solid or liquid form.  Neither side argues that the simple phrase "dielectric material" necessarily specifies one or the other.  Given this fact, the Court concludes that the plain and ordinary meaning of "epoxy dielectric material delivered with solid content" or "dielectric material delivered with solid content" is delivery of a dielectric material the content of which is solid.  Were it not for other portions of the patents, the Court would be inclined to conclude that the form of dielectric material specified in the claims is solid.  This is precisely opposite the argument made by Defendants – that the ***only form*** of dielectric material permitted under the claims is liquid.  The plain meaning does not support Defendants' position.

## B.    Specification.

The specification provides clarification.  Dielectric material is applied to the multi-layer electronic device in Step 3 of the process described in the patents.  The specification gives this description of Step 3:

> Step 3 includes applying the dielectric material to the outermost surface of the conductive layer (and the base if appropriate for the circuitry or electrical device at issue) prepared in accordance with step 2.  ***The dielectric material can be applied by as [sic] a (dry film), a (liquid) curtain coating, a (liquid) roller coating, or an analogous application or bonding technique.***

'582 Patent at 5:15-21.[6]  This language explains that the patented invention can use either dry or liquid dielectric material.  The explanation is unambiguous.

---

[6] Some sentences in the specification include numbers that refer to specific components of the figures shown at the beginning of the specification.  Quotations throughout this order omit those numbers.

The specification goes on to provide a preferred embodiment for the invention.  It includes this explanation:

> Turning now particularly to the process for forming the teeth and the cavities for the teeth, the present invention **can be carried out** by a new use of a CIBA-GEIGY product known as Probelec XB 7081 as a photoimagable dielectric material.  Generally, and in accordance with its specifications sheet, Probelec XB 7081 is a single component, 100% epoxy photodielectric material especially developed for . . . multi-layer boards.

*Id*. at 6:41-48.

As is clear from this language, the use of XB 7081 is a preferred embodiment, an illustration.  The specification says only that the patent "can be carried out" by using this product, which is a liquid, not that it must be carried out in this manner.  Later portions of the specification continue discussion of this preferred embodiment.  When the specification describes the method for applying the dielectric material, it again uses XB 7081 as an illustration.  *Id*. at 7:15-37.

"[I]t is improper to read limitations from a preferred embodiment described in the specification – even if it is the only embodiment – into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004).  Unlike the Category 1 phrases discussed above, where the specification clearly distinguishes the invention from the prior art single desmear process, the specification and other intrinsic evidence contain no clear indication that the dielectric material to be used in the patented process must be liquid.  Nor does the specification describe "the present invention" as not including solid forms of dielectric material.  For a court to find that a specification has disclaimed a particular possible interpretation of the claims, "there must be a clear and unmistakable disclaimer." *Thorner*, 669 F.3d at 1366-67; *see also Pacing Techs.*, 778 F.3d at 1024. The patents' preferred embodiment of XB 7081 does not constitute a clear and unmistakable disclaimer of a solid dielectric material.

### C.   Prosecution History.

Defendants look to the prosecution history to support their argument that the dielectric material must be applied in liquid form.  Doc. 188 at 14-15.  But the legal standard for finding a prosecution history disclaimer requires "a clear and unmistakable disavowal of scope during prosecution."  *Purdue Pharma L.P. v. Endo Pharm. Inc.*, 438 F.3d 1123, 1136 (Fed. Cir. 2006).  Ambiguous statements in the prosecution history will not support a finding of disclaimer.  *SanDisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1287 (Fed. Cir. 2005) ("There is no 'clear and unmistakable' disclaimer if a prosecution argument is subject to more than one reasonable interpretation, one of which is consistent with a proffered meaning of the disputed term."); *see also LG Elecs., Inc. v. Bizcom Elecs., Inc*., 453 F.3d 1364, 1373-74 (Fed. Cir. 2006) (finding that prosecution history statements were not sufficiently clear to justify limiting claims), *reversed on other grounds by Quanta v. LG Elecs.*, 128 S. Ct. 2109 (2008).

Defendants note that the examiner for the '560 Patent rejected a number of claims because "[i]t is not clear as to what is meant by a dielectric material being delivered with solid content and it is also unclear as to how epoxy uses non-homogeneity with the solid content."  Doc. 183 at 158.  The applicants responded with a document submitted on June 25, 2012.  Doc. 188-3 at 96-109.  The document attached a declaration by Dr. Wong.  *Id.* at 107-109.  The relevant portions of the document provide this explanation:

> Dr. Wong testifies that, from the identified passages of the specification of the subject application, one of ordinary skill would understand that the specification disclosed the use of a generally liquid epoxy non-homogeneous dielectric, specifically as noted by the Examiner in the Action Sentence bridging [pages] 3 and 4.  As noted by Dr. Wong, by describing the epoxy as having a solid content of 58%, one skilled in the art would understand that Probelec XB 7081 includes solid particles suspended in a generally liquid epoxy.
>
> * * *
>
> As discussed above, the specification describes the use of a "dielectric material" with "non-homogeneous composition . . . to bring out uneven chemical resistance, such that slowed and/or repeated etching will form teeth instead of a uniform etch."  The operation of this aspect of the process of the present application is explained in the Declaration, Paragraph 7.  In addition, the Specification describes the use of an epoxy, e.g., Probelec

XB 7081, having "a solid content of 58%." By describing the epoxy as having a solid content of 58%, one skilled in the art would understand that Probelec XB 7081 includes solid particles in a percentage of 58% suspended in a generally liquid epoxy and that utilization of an epoxy "delivered with solid content" similar to Probelec as the applied dielectric material.

*Id.* at 103-104. Defendants also emphasize this paragraph from Dr. Wong's attached declaration:

I have been asked to comment on the question of disclosure in the original specification for the claim language requiring an epoxy dielectric material delivered with solid content . . . . A particular example of this epoxy having solid content is disclosed as Probelec XB 7081 as described in paragraphs (0051-0065). Paragraphs (0051 to 0060) describe the various properties of this epoxy material. In paragraph (0056), McDermott discloses a "solid content of 58%." By describing this epoxy as having a solid content of 58%, I understand that Probelec XB 7081 includes solid particles suspended in a generally liquid epoxy.

*Id.* at 108.

Defendants contend that this language amounts to a disclaimer of solid dielectric material for the patented process. The Court does not agree.

Portions of the quoted language simply describe XB 7081, the product used in the specification's preferred embodiment. These portions state that XB 7081 includes solid particles suspended in a generally liquid epoxy. Such a description of a product used in a preferred embodiment does not constitute a disclaimer of all other possible forms of dielectric material.

Other portions of the quoted language refer to epoxy "having a solid content of 58%," and state that one skilled in the art would understand this to mean a liquid containing solid particles. But the reference to 58% does not appear in any of the Category 2 claims to be construed – they all refer to dielectric material "delivered with solid content." The fact that dielectric material "having a solid content of 58%" suggests a liquid with 58% solid particles, as the statements from the prosecution history say, does not mean that the phrase "delivered with solid content," standing alone, also means a liquid. At most, the statements are ambiguous.

The prosecution history does not clearly and unmistakably disavow use of solid dielectric materials. *Purdue*, 438 F.3d at 1136. As a result, the Court cannot rely on the prosecution history as a basis for concluding that solid dielectric materials are excluded from the patent. To the contrary, the specification expressly states that a dry film dielectric material may be used.

**V.     Category 3.**

The parties' third category of claim terms are "means-plus-function limitations." Doc. 177 at 2-3. The relevant statute provides that "[a]n element in a claim for a combination may be expressed as a means or a step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim ***shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.***" 35 U.S.C. § 112(f). When this statute applies to a claim, the claim is construed by identifying the "function" associated with the plain language, and then identifying the corresponding "structure" in the specification that is associated with that function.

The parties have identified three claim terms requiring construction, and agree that each of these terms constitutes a means-plus-function limitation. The parties also agree on the function for each term. The Court's task, therefore, is to find the corresponding "structure" in the specification for each function.

The first limitation, found in the '582 Patent, is "means for joining the conductive layer to the dielectric material." Doc. 177 at 15. The parties agree that this claim has the following function: "joining the conductive layer to the dielectric material." *Id.*

The second claim also comes from the '582 Patent and reads: "means for mechanically gripping a conductive layer to the surface of the dielectric material so that the conductive layer is burrowed in and under the top surface of the dielectric material." *Id.* The parties agree on the following function for this claim: "mechanically gripping a conductive layer to the surface of the dielectric material so that the conductive layer is burrowed in and under the top surface of the dielectric material." *Id.*

The third term comes from the '105 Patent and reads: "means for interlocking a conductor part of the circuitry configured for filling cavities with an epoxy dielectric material disposed in combination with the circuitry and coupled with the conductor part." *Id.* at 116. The parties agree on this function: "interlocking a conductor part of the circuitry configured for filling cavities with an epoxy dielectric material disposed in combination with the circuitry and coupled with the conductor part." *Id.*

The parties disagree on the structure that should correspond to each claim. With respect to the first claim, Plaintiff asserts that the structure should be Figure 1 of the '582 Patent, together with the following statement from the specification: "It could also be said that the layers joined in a saw-toothed manner, i.e., teeth made of both materials in an interlocking bite." Defendants, on the other hand, contend that the structure should include seven paragraphs from the '582 Patent specification – paragraphs that discuss the connection between the dielectric material and the conductive layer in considerable detail. These paragraphs include a discussion of teeth, a saw-toothed description of the teeth, a triangular shape description of the teeth, canine or fang-shaped teeth, and preferable sizes and frequencies for the teeth. '582 Patent at 3:18 to 4:11.

With respect to the second claim term, Plaintiff contends that the corresponding structure consists of Figure 1 and the following statement:

> However, the preferred embodiment utilizes a surface of obtuse, canine, or fang-shaped teeth to help the conductive coating hook under the exterior surface of the applied dielectric material to mechanically grip the applied dielectric material. The obtuse, canine, or fang-shaped teeth are in contrast to the shallower, more rounded surface typically produced by known roughening techniques. Note in FIG. 2 that roughening techniques can produce some occasional gouging but nothing on the order of the present invention.

'582 Patent at 3:42-51. Defendants propose the same seven-paragraph structure that they advocate with respect to the first claim.

For the third claim, which is found in the '105 Patent, Plaintiff proposes that the structure include Figure 1 and the following language from the specification:

> The invention can be carried by forming cavities in the applied dielectric material for receiving the teeth, and then forming the teeth from the conductive coating and metal layer formed thereon. Generally, the teeth can be of any triangular shape (e.g., equilateral, isosceles, scalene, right, obtuse, or any combination thereof). Preferably, though, the teeth are obtuse so as to hook or angle under the exterior surface of the applied dielectric material.

'105 Patent at 3:40-47. Defendants propose the same seven-paragraph structure that they propose for the other claims. *Id.* at 3:26-4:29.

The Federal Circuit has instructed "that corresponding structure must include all structure that actually performs the recited function." *Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*, 296 F.3d 1106, 1119 (Fed. Cir. 2002); *see also Callicrate v. Wadsworth Mfg., Inc.*, 427 F.3d 1361, 1369 (Fed. Cir. 2005) (holding that it was error for the district court to limit the corresponding structure to the preferred embodiment and not include "all structure in the specification corresponding to the claimed function"). In light of this guidance, the Court concludes that Plaintiff's proposed structures are too narrow. Although they include some discussion of the means by which the conductive and dielectric layers adhere to each other, those discussions do not include "all structure" described in the specification "that actually performs the recited function." *Cardiac Pacemakers*, 296 F.3d at 1119. The Court also disagrees with Plaintiff's suggestion that the words "joining," "mechanically gripping," and "interlocking" have different meanings. These terms are not defined in the patents. Each is used to describe the means by which the layers adhere to each other. And, as Defendants note, these terms are used interchangeably in some parts of the specification. *See, e.g.,* '582 Patent at 1:50-57, 3:21-23.

The seven paragraphs identified by Defendants describe the structure by which the dielectric material adheres to the conductive layer in more detail, but even they leave out some structure, and the Court has difficulty understanding how these technical and lengthy paragraphs could be used by a jury to determine whether the accused products infringe. Indeed, both sides acknowledged during the *Markman* hearing that it would be

best to prepare for the jury a short and clear description of the structure that corresponds to the functions identified above.

The disagreement between the parties seems to be over which portions of the structure discussed in the specification must be present for a product to infringe. Plaintiff contends that the presence in the accused product of any part of the structure will be sufficient. Defendants argue that at least four different components of the structure must be present before infringement is found. Defendants identify these components by looking to parts of the specification that are not included in their seven paragraphs of proposed structure.

The Court concludes that the parties' *Markman* briefs do not provide a sufficient discussion of the law or the specification for the Court to resolve this disagreement. As a result, the Court will require the parties to do the following:

1. Develop an agreed-upon description of each element of structure found in the specification that relates to the adhering function of these claims. This can include separate paragraphs for each element (tooth shape, frequency, size, etc.) or a narrative description of the entire structure. It should be in language suitable for a jury instruction.

2. Brief two questions: (1) As a legal matter, how many elements of a structure must be present in an accused product for a finding of infringement? (2) How does that law apply to these patents – what elements of structure disclosed in the specification must be present for an accused product to infringe in this case?

3. The parties shall confer and, within 10 days of this order, propose a schedule for completing these tasks, including page limitations.

**VI.   Indefiniteness.**

The relevant statute provides that "[t]he specification shall conclude with one or more claims ***particularly pointing out and distinctly claiming*** the subject matter which the applicant regards as his invention." 35 U.S.C. § 112(b). This requirement ensures

that a patentee adequately notifies the public of the scope of his or her invention. "A patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus v. Biosig Instruments, Inc.*, 134 S.Ct. 2120, 2123 (2014). At the same time, however, "absolute precision is unattainable." *Id.* Courts therefore "must take into account the inherent limitations of language" and allow a "modicom of uncertainty" so as to provide appropriate incentives for innovation. *Id.* at 2128. Because an indefinite claim is an invalid claim, an accused infringer must prove indefiniteness clearly and convincingly. *Bancorp Servs., LLC v. Hartford Life Ins. Co.*, 359 F.3d 1367, 1371 (Fed. Cir. 2004).

### A. "A Sample of the Circuitry."

Claims in the '582 Patent require that "a sample of the circuitry" have a frequency of teeth sufficient to provide at least 5,000 teeth per linear inch. '582 Patent, Claims 94, 95, 122. Defendant contends that the phrase "a sample of the circuitry" is indefinite because it does not provide enough precision for a person skilled in the art to determine the scope of the invention with reasonable certainty. *See Nautilus*, 134 S.Ct. at 2129. The Court does not agree.

The specification begins by identifying the location of the teeth that are critical to the patent. Figure 1 is a magnified photograph of the interface between a conductive layer and a dielectric layer in a device made according to the patent, and clearly illustrates the teeth of the two layers that interlock with each other. Figure 2 is a magnified photograph of the same interface in a device made by the prior art. The boundary between the two layers is much smoother and lacks the cavities and teeth illustrated in Figure 1. The specification then provides this explanation:

> FIG. 1 is an illustration of a conductive coating and metal layer on the applied dielectric material with a desirable tooth structure. In contrast, FIG. 2 is an illustration of a prior art conductive coating and metal layer on the applied dielectric material with the surface produced by roughening processes. . . . Compare FIG. 1 and FIG. 2, and note particularly the size, shape, frequency, and depth of the teeth in FIG. 1 with the surface produced by roughening in FIG. 2.

'582 Patent at 3:8-17.

The specification proceeds to explain the nature of the teeth called for by the patents:

> As to frequency, the teeth should be quite frequent in number; at least about 5,000 teeth per linear inch, and preferably about 10,000 per linear inch; and even better is at least about 15,000 teeth per linear inch.

> As to surface area, there should be at least about 25,000 teeth per square inch, better still is essentially at least about 100,000 per square inch, and preferably at least about 200,000 per square inch, or even greater.

*Id.* at 3:62 to 4:2

Having described this tooth frequency, the specification explains:

> It should be recognized that the teeth generally are not formed to a precise dimension. As shown in FIG. 1, some of the teeth are somewhat differently sized, angled, and proportioned. Thus, *a representative sample* of the electrical device should have teeth in about these ranges.

> Having at least about 20% of the teeth in one or more of these ranges, and preferably about 50% is a preferred balance of mechanical grip without a weakening [of] the integrity of the layer, particularly in combination.

*Id.* at 4:3-11.

Several points are apparent from this quoted language. First, the teeth are located at the interface between the dielectric material and the conductive layer. Second, the frequency of the teeth should be at least 5,000 per linear inch and 25,000 per square inch. Although Defendants protest that they don't know where these teeth are located, Figure 1 and this language makes clear that they are located in the interface between the two layers. Third, the specification states that "a representative sample of the electrical device should have teeth in about these ranges." *Id.* at 4:6-7.

In light of this specification, claims in the '582 Patent are not indefinite. Claim 94 states that the patented device includes "a conductive layer of material built up on a surface on a layer of dielectric materials, the layers joined in a saw-tooth manner made of both materials in an interlocking bite." *Id.* at 18:14-17. The claim then states: "[T]he conductive layer is a portion of circuitry of an electrical device, the conductive layer is comprised of teeth such that a sample of the circuitry has a frequency of the teeth

sufficient to provide at least 5,000 of the teeth per linear inch." *Id*. at 18:18-22. According to this language, the conductive layer is a portion of the circuitry, and a sample of the circuitry – the conductive layer – should show a frequency of teeth sufficient to provide at least 5,000 teeth per linear inch. In light of the specification's suggestion that the samples should be "representative," and its unambiguous explanation that the location of the teeth and the area to be sampled is the interface between the dielectric and conductive layers, the Court concludes that a person reasonably skilled in the art could determine how to obtain such a sample.

Defendants argue that the size and location of the sample are not specified in the claim. True, but the size clearly must be large enough to show "a frequency of the teeth sufficient to provide at least 5,000 of the teeth per linear inch," and, according to the specification, should be a "representative sample." The parties may disagree on how big that sample ought to be, but the Court cannot conclude that such disagreement makes this claim indefinite. Persons of ordinary skill in the art would understand a sample size large enough to be representative of the interface as a whole.

The Court disagrees with Defendants' argument that the location of the sample is unknown, or that the sample might even be taken from locations in the electronic device other than the interface between the dielectric material and the conductive layer. Reading the specification leaves no doubt as to the meaning of the claim: the interface is the location of the teeth to be sampled, and the teeth in the interface must be shown by sampling to have a frequency of at least 5,000 per linear inch.

### B. "Upgrade Slope."

Claims in the '582 Patent call for the formation of cavities in the dielectric material "wherein at least one of the cavities includes an upgrade slope with respect to the dielectric material, and one of the teeth engages a portion of the dielectric material at the slope." '582 Patent at 17:58-61. Defendants claim that the phrase "upgrade slope" is indefinite because a person of ordinary skill could not distinguish when a slope is "upgrade" as opposed to "downgrade," or where the slope is located. Plaintiff responds

that the slope, according to the language of each claim at issue, calls for "an upgrade slope **with respect to the surface of the dielectric material**." *See, e.g.,* '582 Patent, Claims 89, 94. Plaintiff argues that this language shows that "upgrade slope" describes the orientation of cavity walls in relation to the surface of the dielectric material. Doc. 200 at 15.

The specification includes this explanation:

> A further way of articulating the "teeth" concept is to view each tooth as being substantially triangular in shape, with the base of the triangle being a plain of the dielectric material before it is etched, or more precisely by the exterior surface thereof. The invention can be carried out by forming cavities in the applied dielectric material for receiving the teeth, and then forming the teeth from the conductive coating and then a layer formed thereon. Generally, the teeth can be of any triangular shape, e.g., equilateral, isosceles, scalene, right, obtuse, or any combination thereof". Preferably, though, the teeth are obtuse so as to hook or angle under the exterior surface of the applied dielectric material.

> The use of any shape of teeth increases the surface area where the conductive coating is on the applied dielectric material. However, the preferred embodiment uses a surface of obtuse, canine, or fang-shaped teeth to help the conductive coating and metal layer hook under the exterior surface of the applied dielectric material.

'582 Patent at 3:28-46.

With this explanation from the specification, the Court concludes that a person of ordinary skill in the industry could understand with reasonable certainty the meaning of the claim at issue: A dielectric material comprising a surface with cavities "wherein at least one of the cavities includes an upgrade slope with respect to the surface of the dielectric material, and one of the teeth engages a portion of the dielectric material at the slope." The cavities formed in the dielectric material must have sloped sides, relative to the flat surface of the dielectric material, and the teeth formed from the conductive layer must engage a portion of the dielectric material at the sloped side of the cavity.

As Plaintiff's counsel conceded at the *Markman* hearing, this terminology does not specify any specific slope or angle, and, as a result, every cavity, no matter how small or shallow, would have sides that are sloped relative to the surface of the dielectric material and therefore satisfy this claim requirement. Indeed, even the undulating surface of the

prior art as illustrated in Plaintiff's opening brief (Doc. 189 at 9, lines 13-15) would appear to satisfy this description. As a result, the Court cannot see how this claim language distinguishes the patented invention from the prior art, but that is not a question of definiteness.

### C. "Peel Strength Greater Than."

Defendants challenge the '582 Patent claims that call for "peel strength greater than a peel strength that would be produced by a single desmear process." Doc. 177 at 18. Defendants agree that "peel strength" is a term of art that generally refers to the adhesive strength that exists between two layers. Doc. 188 at 25. Defendants argue, however, that this claim language specifies no method for measuring peel strength and no criteria for determining the peel strength of a product produced by a single desmear process, and therefore leaves a person of ordinary skill in the art with no basis to determine what measurement is intended.

Plaintiff asserts with some persuasive force that IPC-TM-650, method 2.4.8, is the standardized method for measuring peel strength by one skilled in the art. Doc. 200-3 at ¶ 30. But Plaintiff also argues that any scientifically reasonable method for measuring peel strength could be used, the only requirement being that it show a peel strength in the product made under the patent that is greater than the peel strength of a product made by a single desmear process.

The Court agrees with Plaintiff. Defendants do not contend that the word "greater" is indefinite. And the fact that a particular method of measuring peel strength is not identified does not make the language indefinite. Those skilled in the art know the accepted means for measuring peel strength. Nor is the claim indefinite because the baseline peel strength of a product made with a single desmear process is not specified. No particular peel strength is required; it just must be lower, upon measurement, than the peel strength of the patented product measured by the same method. Persons skilled in the art know how to conduct such measurements and how to locate a product made by a single desmear process.

## D. "Substantially Greater."

Claims 14 and 19 of the '560 Patent and several claims in the '105 Patent call for cavities in the dielectric layer having "a first cross-sectional distance proximate the [initial] surface" and a "substantially greater cross-sectional distance distant from the [initial] surface." Doc. 177 at 19. Defendants contend that the intrinsic record is devoid of any objective criteria for determining how much greater is "substantially greater" within the meaning of the claims, and that these limitations therefore are indefinite. Defendants note that the '912 Patent does not include the word "substantially," calling simply for a "greater cross-sectional distance." As a result, Defendants argue, "substantially" must have some meaning beyond "greater," a meaning not apparent from the intrinsic evidence.

Plaintiff notes that the Federal Circuit has "repeatedly confirmed that relative terms such as 'substantially' do not render patent claims so unclear as to prevent a person of skill in the art from ascertaining the scope of the claim." *Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349, 1359 (Fed. Cir. 2012). Plaintiff agrees, however, on the relevant test: "Such a term is not indefinite if the intrinsic evidence provides 'a general guideline and examples sufficient to enable a person of ordinary skill in the art to determine [the scope of the claims].'" *Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325, 1335 (Fed. Cir. 2010) (citation omitted).

Plaintiff points to the following language from the specification as providing guidance on the meaning of "substantially":

> In comparison with the above-mentioned roughening techniques of the prior art, it is believed that a surface of the teeth is an improvement in that there is an increase in surface area. However, it is still better to use teeth that are fang-shaped to enable a mechanical grip that functions in a different manner than adherence by means of increased surface area. By using the fanged, angled, canine, or otherwise hooked teeth (in addition to increased surface area), there is a multidirectional, three dimensional interlacing and overlapping of layers.

'582 Patent at 1:58-66. Plaintiff also points to language in the specification stating that "the . . . metal layer is actually burrowed under the dielectric material and vice versa." *Id.* at 1:66 to 2:3.

Plaintiff's expert, Dr. Hoffman, provides this explanation of why this description is sufficient for one skilled in the art to understand the meaning of "substantially":

> In light of the specification and the art, a person of ordinary skill would understand that the cross-sectional distance of the interior of a cavity must exceed a crosssectional distance nearer the opening of a cavity enough to create the "mechanical grip" described in the patents and allow the conductive material to burrow "in and under" the dielectric material. *See, e.g.,* '582 Patent at 1:58-2:3.

> A person of ordinary skill in the art would recognize that if the cross-sectional distance of the interior of the cavity only exceeds the cross-sectional distance of the opening by a very slight amount, the mechanical grip disclosed in the patents would not be achieved.

> A person of ordinary skill in the art would further understand that the specific difference between comparative cross-sectional distances may vary based on particular application and material properties. For example, a person having ordinary skill in the art would understand that materials having high tensile strength will more readily grip copper, meaning that the degree of undercutting and burrowing (that is to say the amount which the cross-sectional distance distant the surface is greater than the distance proximate the surface) can be lesser than a material with lower tensile strength.

Doc. 200-3 at ¶¶ 35-37.

As noted above, the Supreme Court recently held that "a patent's claims, viewed in light of the specification and prosecution history, [must] inform those skilled in the art about the scope of the invention with ***reasonable certainty***." *Nautilus, Inc.*, 134 S. Ct. at 2129. After *Nautilus*, the Federal Circuit explained that "[t]he claims, when read in light of the specification and the prosecution history, ***must provide objective boundaries*** for those of skill in the art." *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014). The Federal Circuit also explained that "[w]hen a 'word of degree' is used, the court must determine whether the patent provides '***some standard for measuring that***

*degree*.'" *Biosig inst., Inc. v. Nautilis, Inc.*, 783 F.3d 1374, 1378 (Fed. Cir. 2015) (quoting *Enzo Biochem*, 599 F.3d at 1332).

Although it is a close question, the Court concludes that the patents satisfy this standard. Language from the specification quoted above explains that the cavities should extend under the surface of the dielectric material ("actually burrowed under the dielectric material") so that the teeth that fill the cavities "mechanical[ly] grip" the dielectric material. '582 Patent at 1:58 to 2:3. This suggests that the base of the cavity should not be perfectly aligned with the surface of cavity, the sides of the cavity forming a perpendicular wall, but instead should be sufficiently offset from the surface opening to permit the tooth to engage the dielectric material in a mechanical grip. The Court concludes that one skilled in the art could determine the extent to which the cavity must extend under the dielectric material to permit such a mechanical grip. The claims provide additional guidance by stating that the peel strength formed by these gripping teeth must exceed the peel strength of a layer created by a single-pass desmear process. And Figure 1 provides further explanation, illustrating the kinds of cavities and teeth intended by the patent.

Admittedly, this language requires some judgment by persons skilled in the art, but it is judgment informed by the intended function of the cavities (to create a mechanical grip), the result that should be realized (peel strength greater than single-pass desmearing creates), and the illustration in Figure 1. As the Federal Circuit explained after *Nautilus*, "absolute or mathematical precision is not required." *Interval Leasing*, 766 F.3d at 1370. The Federal Circuit also favorably cited its previous holding that the phrase "not interfering substantially" was not indefinite even though the construction "define[d] the term without reference to a precise numerical measurement." *Enzo Biochem*, 599 F.3d at 1335.

**E.     Indefiniteness Conclusion.**

With respect to the claims in Category 4, the Court concludes that Defendants have not satisfied their "clear and convincing" burden of showing that the claims are indefinite.

Dated this 9th day of August, 2017.

_____
David G. Campbell
United States District Judge